**FILED**
July 20, 2026
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY: CM
DEPUTY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| BUSINESS DEVELOPMENT NETWORK, LLC; THE POD CONSULTING COMPANY, INC.; and LEAFY LIVING, LLC, | § | |
| Plaintiffs, | § | |
| v. | § | 5:26-CV-00708-MA |
| CG FINANCIAL SERVICES, INC., d/b/a "CASH GRAB"; ANDREW DEMAIO, Individually, | § | |
| Defendants. | § | |

## OPINION AND ORDER

The Court now considers the Motion for Default Judgment[1] filed by Plaintiffs Business Development Network, LLC; The Pod Consulting Company, Inc.; and Leafy Living, LLC ("Plaintiffs"). Having considered the motion, record, and relevant legal authorities, the Court **GRANTS** the instant motion **IN PART** and enters **DEFAULT JUDGMENT** in favor of Plaintiffs and against Defendant CG Financial Services, Inc. d/b/a "Cash Grab" as to Plaintiffs' breach-of-contract claim.

### I. BACKGROUND

This is a Racketeer Influenced and Corrupt Organizations Act ("RICO"), fraud-by-inducement, and breach-of-contract case. The following relevant background was obtained from Plaintiffs' complaint:

[1] Dkt. No. 16.

In or around mid-2021, [Business Development Network, LLC] was introduced to Cash Grab and Andrew DeMaio through a merchant account broker.

During initial meetings and communications, DeMaio represented that Cash Grab was FDIC insured and partnered with legitimate financial institutions.

DeMaio further represented that Cash Grab could provide full business banking services, including business checking accounts, merchant processing services, ACH and wire transfer capabilities, and secure cash pickup, courier, and deposit services.

These representations were material to Plaintiffs, whose seminar business generated substantial cash receipts, and Plaintiffs reasonably relied on Defendants' assurances that funds would be deposited with legitimate banking partners.

Each of these representations was false when made.

Relying on Defendants' representations, [Business Development Network, LLC], The Pod Consulting Company, Inc., and Leafy Living, LLC each opened separate business accounts with Cash Grab and deposited funds originating from Texas-based operations.

By January 2022, the balances held by Cash Grab on behalf of Plaintiffs included approximately $89,670 for [Business Development Network, LLC], $63,000 for The Pod Consulting Company, Inc., and approximately $6,000 for Leafy Living, LLC.

Defendants exercised exclusive custody and control over Plaintiffs' funds and prevented Plaintiffs from accessing those funds outside of Defendants' systems.

In late December 2021, Cash Grab began experiencing unexplained issues accounting for cash pickups and deposits ordered by [Business Development Network, LLC].

In late January 2022, DeMaio became unresponsive, and Plaintiffs lost access to their Cash Grab accounts until a Cash Grab employee temporarily restored account access.

On or about January 19 and 20, 2022, Plaintiffs initiated transfers of all funds from their Cash Grab accounts to their primary operating bank accounts in Texas.

> Defendants transmitted electronic account statements and confirmations falsely reflecting that the transfers were completed and that Plaintiffs' Cash Grab account balances were reduced to zero.
>
> Despite these representations, no such transfers were received, and Plaintiffs' funds were never returned.
>
> On or about February 10, 2022, Plaintiffs learned from a risk-compliance officer at First Security Bank in Las Vegas, Nevada, that Cash Grab's account had been involuntarily closed on about September 7, 2021.
>
> Defendants nevertheless continued to represent, including through October 2021 and thereafter, that First Security Bank was Cash Grab's banking partner while continuing to solicit and accept Plaintiffs' funds.[2]

## II. PROCEDURAL HISTORY

Plaintiffs commenced this action on February 4, 2026.[3] Summons were issued as to CG Financial Services, Inc. d/b/a "Cash Grab" ("Cash Grab") and Andrew DeMaio ("DeMaio") (collectively, "Defendants") on February 9, 2026.[4] Return of service for the executed summons were filed for Defendants on April 16, 2026.[5] Thus, service was executed on all parties named in Plaintiffs' complaint.

Neither Defendant filed an answer. Plaintiffs filed their request for Clerk's entry of default for Defendants on May 12, 2026,[6] and the Clerk entered default that same day.[7]

---

[2] Dkt. No. 1, at ¶¶ 17–31.
[3] Dkt. No. 1.
[4] Dkt. No. 5.
[5] Dkt. Nos. 9–10.
[6] Dkt. No. 13.
[7] Dkt. No. 14.

## III. Jurisdiction

The Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as Plaintiffs assert claims arising under RICO that present a federal question. The Court also has supplemental jurisdiction over Plaintiffs' related state and common law fraud-by-inducement and breach-of-contract claims pursuant to 28 U.S.C. § 1367 because they arise from a common nucleus of operative fact.

This Court also has diversity subject-matter jurisdiction under 28 U.S.C. § 1332. Plaintiffs allege that they are citizens of Texas and Delaware, and Defendants are citizens of Nevada,[8] and the amount-in-controversy exceeds $75,000.[9]

## IV. Discussion

### a. Legal Standard

Obtaining a default judgment is a three-step process: "(1) default by the defendant; (2) entry of default by the Clerk's office; and (3) entry of a default judgment."[10] Once entry of default is made, "plaintiff may apply for a judgment based on such default. This is a *default judgment*."[11] Defendants have defaulted by failing to answer or otherwise appear in this case and the Clerk has already entered default against them.[12] The only remaining question is whether the third step, entry of default judgment, is appropriate.

Federal Rule of Civil Procedure 55(b) authorizes entry of default judgment with court approval, which is not lightly granted. Default judgments are a disfavored and drastic remedy, resorted to only in exceptional circumstances such as an unresponsive party.[13] The Court will not

---

[8] *See* Dkt. Nos. 1, at ¶ 6; 12, at 1–2.
[9] *See* Dkt. No. 1, at ¶ 23.
[10] *Bieler v. HP Debt Exch., LLC*, No. 3:13-CV-01609, 2013 WL 3283722, at *2 (N.D. Tex. June 28, 2013) (citing *N.Y. Life Ins. Co. v. Brown,* 84 F.3d 137, 141 (5th Cir. 1996)).
[11] *N.Y. Life Ins. Co.*, 84 F.3d at 141.
[12] Dkt. No. 14.
[13] *Sun Bank of Ocala v. Pelican Homestead & Sav. Ass'n*, 874 F.2d 274, 276 (5th Cir. 1989).

grant default judgment automatically or as a matter of right, even if a defendant is in default.[14] Whether to grant default judgment is left to the sound discretion of the district court.[15] Adjudicating the propriety of default judgment is itself a three-step process.

First, the Court must determine whether a plaintiff's claims are well-pled and substantively meritorious.[16] After all, a defendant's failure to answer or otherwise defend does not mean the particular legal claims asserted are valid and merit judgment against the defendant.[17] When analyzing the merits of claims, the Court may assume the truth of all well-pled allegations in the plaintiff's complaint because all defaulting defendants functionally admit well-pled allegations of fact.[18] But the Court will not hold the defendants to admit facts that are not well-pled or to admit conclusions of law.[19]

Second, if the plaintiff states a well-pled claim for relief, the Court examines six factors to determine whether to grant default judgment:

> [W]hether material issues of fact are at issue, whether there has been substantial prejudice, whether the grounds for default are clearly established, whether the default was caused by a good faith mistake or excusable neglect, the harshness of a default judgment, and whether the court would think itself obliged to set aside the default on the defendant's motion.[20]

Third, if the plaintiff's claims are meritorious and default judgment appears appropriate, the Court must determine whether the requested relief is proper. Specifically, default judgment "must not differ in kind from, or exceed in amount, what is demanded in the pleadings."[21] The

---

[14] *Ganther v. Ingle*, 75 F.3d 207, 212 (5th Cir. 1996).
[15] *Mason v. Lister*, 562 F.2d 343, 345 (5th Cir. 1977).
[16] *See Wooten v. McDonald Transit Assocs.*, 788 F.3d 490, 498 (5th Cir. 2015).
[17] *See Nishimatsu Constr. Co. v. Hous. Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975).
[18] *Id.*; *see Frame v. S-H, Inc.*, 967 F.2d 194, 205 (5th Cir. 1992) ("Unlike questions of actual damage, which must be proved in a default situation, conduct on which liability is based may be taken as true as a consequence of the default.").
[19] *Escalante v. Lidge*, 34 F.4th 486, 493 (5th Cir. 2022) (citing *Nishimatsu Constr. Co.*, 515 F.2d at 1206).
[20] *Lindsey v. Prive Corp.*, 161 F.3d 886, 893 (5th Cir. 1998).
[21] FED. R. CIV. P. 54(c); *see also Ditech Fin., L.L.C. v. Naumann*, 742 F. App'x 810, 813 (5th Cir. 2018) (holding that rendering relief in a default judgment differs from other kinds of judgment).

Court will determine how to calculate damages. The general rule is "unliquidated damages normally are not awarded without an evidentiary hearing" but the exception is when "the amount claimed is a liquidated sum or one capable of mathematical calculation."[22] When this exception applies, there is no need for an evidentiary hearing and the Court can enter default judgment on the papers.

**b. Analysis**

As a preliminary matter, the Court observes that all three of Plaintiffs' claims are subject to a four-year statute of limitations, which begin accruing either at the time of the earliest injuring conduct or at the time that such conduct should have been discovered.[23] Plaintiffs seek recovery for injuries they appear to have sustained in January 2022, but did not initiate this action until February 4, 2026.

The statute of limitations constitutes an affirmative defense that is waived if not timely asserted.[24] The United States Court of Appeals for the Fifth Circuit has held that a court may, at a minimum, consider the statute of limitations when considering a motion for default judgment in a proceeding where any defendant has raised it as a defense.[25] However, no defendant has asserted a statute of limitations defense in the present case. In the absence of controlling authority requiring sua sponte consideration of whether Plaintiffs' claims are time-barred, the Court declines to address the applicability of the statute of limitations here.

---

[22] *Leedo Cabinetry v. James Sales & Distrib., Inc.*, 157 F.3d 410, 414 (5th Cir. 1998) (quoting *James v. Frame*, 6 F.3d 307, 310 (5th Cir. 1993)).

[23] *See Agency Holding Corp. v. Malley–Duff & Assocs.,* 483 U.S. 143, 156 (1987) (civil RICO claims); TEX. CIV. PRAC. & REM. CODE ANN. §§ 16.004(a) (fraudulent inducement), 16.051 (breach-of-contract).

[24] *See* FED. R. CIV. P. 8(c); *see also Davis v. Huskipower Outdoor Equip. Corp.*, 936 F.2d 193, 198 (5th Cir. 1991).

[25] *Brown v. City of Cent.*, No. 23-30146, 2024 WL 546340, at *9 (5th Cir. Feb. 12, 2024) (quoting *Lewis v. Lynn*, 236 F.3d 766, 767 (5th Cir. 2001) ("[W]here 'a defending party establishes that plaintiff has no cause of action ... this defense generally inures also to the benefit of a defaulting defendant."); *see also Hamad v. Ctr. for Study of Popular Culture*, No. A-06-CA-285-SS, 2007 WL 9701889, at *2 (W.D. Tex. Jan. 17, 2007), *aff'd sub nom. Hamad v. Ctr. for Jewish Cmty. Stud*., 265 F. App'x 414 (5th Cir. 2008).

*1. RICO*

Plaintiffs first assert a RICO cause of action under 18 U.S.C. §§ 1962(c), 1962(d), and 1964. Pursuant to 18 U.S.C.A. § 1962, it is unlawful "for any person employed by or associated with any enterprise . . . to conduct or participate . . . . [in] a pattern of racketeering activity[.]"[26] "[A] civil RICO plaintiff must show (1) a violation of § 1962, (2) an injury to his or her business or property, and (3) that such injury was proximately caused by a RICO violation."[27] "Racketeering activity" consists of two or more predicate criminal acts, including acts indictable under 18 U.S.C. § 1343 (which concerns wire fraud), that are related and "amount to or pose a threat of continued criminal activity."[28] A RICO claim must be pleaded with "specific facts, not mere conclusions," even when a default judgment is sought.[29]

Plaintiffs allege that, following the involuntary closure of Cash Grab's account at First Security Bank on September 7, 2021, Defendants continued to solicit and accept Plaintiffs' funds.[30] Soon thereafter, Cash Grab "began experiencing unexplained issues accounting for [requested] cash pickups and deposits[,]" and Plaintiffs briefly lost access to their Cash Grab accounts.[31] In January 2022, DeMaio became unresponsive, and although Plaintiffs initiated transfers of all funds from their Cash Grab accounts to their primary operating bank accounts in Texas on or about January 19 and 20, 2022, Plaintiffs never received the transferred funds.[32] Plaintiffs provide the

---

[26] *Abraham v. Singh*, 480 F.3d 351, 355 (5th Cir. 2007) (internal citations omitted); *see also* 18 U.S.C.A. §§ 1961(1), 1962(c).
[27] *Lewis v. Danos*, 83 F.4th 948, 956 (5th Cir. 2023) (internal citations omitted).
[28] *Abraham*, 480 F.3d at 355 (quoting *Word of Faith World Outreach Ctr. Church, Inc. v. Sawyer,* 90 F.3d 118, 122 (5th Cir.1996) (citing *H.J. Inc. v. Nw. Bell Tel. Co.,* 492 U.S. 229, 239 (1989))
[29] *Cartwright v. Ghattas*, No. A-09-CA-408-SS, 2010 WL 11506415, at *3 (W.D. Tex. Mar. 16, 2010) (citing *Montesano v. Seafirst Com. Corp.,* 818 F.2d 423, 427 (5th Cir. 1987); *Manax v. McNamara,* 842 F.2d 808, 811 (5th Cir. 1988)).
[30] Dkt. No. 1, at ¶¶ 30–31.
[31] Dkt. No. 1, at ¶¶ 25–26.
[32] Dkt. No. 1, at ¶¶ 27–29.

Court with: a copy of the Cash Grab website materials, wherein Cash Grab indicates that its services provide customers "access to" FDIC-insured financial services and bank accounts;[33] correspondence from Cash Grab and DeMaio confirming the establishment of Business Development Network, LLC's account with Cash Grab in April and May 2021;[34] documents reflecting Business Development Network, LLC and The Pod Consulting Company's accounts with First Security Bank of Nevada through Cash Grab.[35] Plaintiffs also provide the affidavit of their joint owner, Armando Montelongo, who attests that "Defendants held funds belonging to Plaintiffs" and "transmitted account statements or confirmations reflecting that the transfers had been completed and that Plaintiffs' Cash Grab account balances had been reduced to zero," but that "Plaintiffs did not receive the transferred funds."[36]

The Court finds that Plaintiffs' assertions do not support a finding that Defendants engaged in a pattern of racketeering activity. To qualify as a pattern of racketeering activity, qualifying criminal activity must either be repeated over a closed period that spans a "substantial period of time," or occur over an open-ended period that "by its nature projects into the future with a threat of repetition" or suggests "that the predicates are a regular way of conducting [a] defendant's ongoing legitimate business."[37] The unlawful conduct alleged by Plaintiffs spans, at most, several months, less than the "substantial period of time" required in the Fifth Circuit to establish closed-ended continuity.[38] Nor have Plaintiffs alleged facts that would support a finding of open-ended continuity. They identify no specific threat of ongoing or future racketeering beyond the

[33] Dkt. No. 16-3, at 1–3.
[34] Dkt. No. 16-3, at 10–11.
[35] Dkt. No. 16-3, at 12–13.
[36] Dkt. No. 16-4, at ¶¶ 4–8.
[37] *Malvino v. Delluniversita*, 840 F.3d 223, 231–32 (5th Cir. 2016) (citing *H.J. Inc.*, 492 U.S. at 241–43).
[38] *See id.* (finding no continuity where wire fraud occurred only in a five-month period and no evidence existed of fraudulent practices related to other individuals).

conclusory assertion that Defendants' conduct poses "a threat to other similarly situated victims."[39] Instead, Plaintiffs describe an isolated period of unlawful acts that occurred from September 2021 to January 2022, with no allegation that Defendants committed any predicate acts in the years between the last complained-of conduct and the filing of this lawsuit or that Defendants even remain in operation. Accordingly, the Court finds that they have failed to allege open-ended continuity and therefore have not alleged a pattern of racketeering activity sufficient to warrant default judgment on this claim.

2. *Fraudulent Inducement*

Plaintiffs next assert a claim of Texas common-law fraudulent inducement. "Fraudulent inducement 'is a particular species of fraud that arises only in the context of a contract and requires the existence of a contract as part of its proof.'"[40] "Under Texas law, a claim for fraudulent inducement requires proof of: (1) a material misrepresentation; (2) knowledge of falsity or reckless disregard for the truth, coupled with an intent to induce the plaintiff to enter into a contract; (3) actual and justifiable reliance by the plaintiff on the misrepresentation; and (4) injury resulting from that reliance."[41]

Plaintiffs do not provide the agreements they purport to have entered into when forming their accounts with Cash Grab. For the purpose of analysis, the Court assumes from the information available on the record that Plaintiffs entered into a binding contract with Cash Grab for banking services. As to the remaining elements of fraudulent inducement, Plaintiffs allege that Cash Grab "held itself out as a financial services and alternative banking provider."[42] Plaintiffs further allege

---

[39] Dkt. No. 1, at ¶ 37.

[40] *Bohnsack v. Varco, L.P.*, 668 F.3d 262, 277 (5th Cir. 2012) (quoting *Haase v. Glazner*, 62 S.W.3d 795, 798–99 (Tex. 2001)).

[41] *Hoffman v. L & M Arts*, 838 F.3d 568, 576 (5th Cir. 2016) (internal citations omitted).

[42] Dkt. No. 1, at ¶ 15.

that "[d]uring initial meetings and communications, [Defendant Andrew] DeMaio represented that Cash Grab was FDIC insured and partnered with legitimate financial institutions," but that "[e]ach of these representations was false when made."[43] Plaintiffs assert that these representations "were material to Plaintiffs," that "Plaintiffs reasonably relied on Defendants' assurances that funds would be deposited with legitimate banking partners,"[44] and that the injuries Plaintiffs sustained as a result of Defendants' fraudulent wire transfers occurred as a direct result of Defendants' misrepresentations.

The Court concludes that Plaintiffs' allegations of fraudulent inducement, which largely track the elements of fraudulent inducement in a conclusory manner, are insufficient to support entry of default judgment against either Defendant. Plaintiffs' claim that Defendants were not partnered with a legitimate financial institution when Plaintiffs opened their Cash Grab accounts in mid-2021 appear to conflict with their own assertion that Defendants maintained an FDIC-insured bank account with First Enterprise Bank until September 7, 2021.[45]

As to Plaintiffs' allegations that Cash Grab falsely represented its FDIC-insured status, the complaint's vague description of those representations makes it unclear whether Cash Grab claimed that it was itself FDIC-insured or merely that it partnered with FDIC-insured institutions to provide banking services. This ambiguity makes it difficult for the Court to determine the sufficiency of Plaintiffs' allegations that Defendants acted with fraudulent intent to deceive. Even assuming, *arguendo*, that "Defendants falsely held themselves out as a legitimate, FDIC-insured banking and financial services provider capable of offering full business banking services,"

[43] Dkt. No. 1, at ¶ 21.
[44] Dkt. No. 1, at ¶ 20.
[45] Dkt. No. 1, at ¶ 30.

Plaintiffs have not adequately alleged facts showing that their reliance on those representations was justifiable.

Justifiable reliance is a question of fact, requiring the Court to assess "whether, given a fraud plaintiff's individual characteristics, abilities, and appreciation of facts and circumstances at or before the time of the alleged fraud[,] it is extremely unlikely that there is actual reliance on the plaintiff's part."[46] Here, the record contains little information about Plaintiffs' sophistication beyond that they are jointly owned business entities that collectively deposited more than $150,000 with Cash Grab. From those allegations, the Court reasonably infers that Plaintiffs possessed at least some degree of business acumen. Plaintiffs appear to allege that Cash Grab's representations regarding FDIC-insured status were material to their decision to open accounts with Cash Grab.[47] This implies that Plaintiffs should have possessed at least a rudimentary understanding of what FDIC insurance is—namely, a federal insurance program that protects deposit accounts held with FDIC-insured banks and savings associations and which, by its nature, does not protect non-deposit financial products and services. Plaintiffs do not explain how they could reasonably believe that Cash Grab was itself an FDIC-insured banking entity while at the same time relying on Cash Grab's representations that it deposited client funds with "legitimate," FDIC-insured "banking partners."[48] Nor do Plaintiffs explain how the FDIC-insured status of their depository accounts could conceivably be a source of protection for the injury they describe. Properly construed, Plaintiffs' assert a loss arising from fraudulent wire transfers and withdrawals, not from the failure of an FDIC-insured institution or the collapse of deposit insurance. In that posture, Plaintiffs have not plausibly alleged that FDIC status was material to or could have safeguarded against, the

[46] *IAS Servs. Grp., L.L.C. v. Jim Buckley & Assocs., Inc.*, 900 F.3d 640, 650 (5th Cir. 2018) (internal citations and quotation marks omitted).
[47] *See* Dkt. No. 1, at ¶¶ 18–20.
[48] *See* Dkt. No. 1, at ¶¶ 18–20.

material losses they suffered as a result of Defendants' alleged misconduct. On this record, the Court finds that default judgment against Defendants is not warranted on this claim.

*3. Breach of Contract*

Plaintiffs also assert a breach-of-contract claim, alleging that Defendants breached the parties' banking services agreement "by blocking access to Plaintiffs' accounts and failing to remit Plaintiffs' deposited funds."[49] "In Texas, [t]he essential elements of a breach of contract action are: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach."[50] "A breach occurs when a party fails to perform a duty required by the contract."[51]

Plaintiffs do not provide a copy of any contractual agreement between the parties. Nevertheless, the uncontested evidence, including the affidavit submitted by Plaintiffs' owner, Armando Montelongo and summary-judgment-type evidence submitted by Plaintiffs supports a finding that Plaintiffs entered into a banking services agreement with Cash Grab under which they established accounts to access various business banking services.[52] The evidence further shows that Cash Grab failed to provide these services from September 2021 to January 2022, during which time Cash Grab issued inaccurate transfer confirmations and falsely represented that all funds Plaintiffs had deposited with Cash Grab had been withdrawn and returned to Plaintiffs.[53] These misrepresentations and inaccurate transfer confirmations constituted Cash Grab's failure to provide Plaintiffs with the banking services the parties had agreed upon and directly caused Plaintiffs to suffer a loss of $158,670.00.[54]

---

[49] Dkt. No. 16, at 5; *see also* Dkt. No. 1, at ¶¶ 25–29.
[50] *Smith Int'l, Inc. v. Egle Grp., LLC*, 490 F.3d 380, 387 (5th Cir. 2007) (internal quotation marks omitted).
[51] *Id.*
[52] *See* Dkt. No. 16-3, at 1–36.
[53] Dkt. No. 16-4, at ¶¶ 5–9.
[54] *See* Dkt. No. 16-4, at ¶ 5.

On this record, the Court concludes that Plaintiffs have raised their right to relief on the breach-of-contract claim above a speculative level and that default judgment on that claim is warranted against Cash Grab, but not against DeMaio. Although Plaintiffs have provided evidence supporting that DeMaio signed the banking services agreements formed between Plaintiffs and Cash Grab, nothing in the record or Plaintiffs' allegations support a finding that DeMaio signed in his individual capacity or that DeMaio assumed any contractual obligations separate and apart from those he assumed as founder, owner, and chief executive officer of Cash Grab.[55] In the absence of allegations or evidence that DeMaio agreed to be individually bound, the Court finds no basis to impose contractual liability on him, and limits the breach-of-contract judgment to the entity defendant, Cash Grab.

*4. Damages*

The final step in assessing default judgment is to determine what form of relief, if any, a plaintiff should receive.[56] Plaintiffs first request $158,670.00 in actual damages. In their complaint and the affidavit of Armando Montelongo, Plaintiffs establish that Defendants failed to return the amounts outstanding in Plaintiffs' deposit accounts with Cash Grab, resulting in actual losses in the amount of $ 89,670.00 as to Defendant Business Development Network, LLC; $63,000.00 as to The Pod Consulting Company, Inc.; and $6,000 as to Leafy Living, LLC.[57]

Plaintiffs additionally request pre-judgment interest on their actual damages in the amount of $82,164.00, calculated from the date of Defendants' failure to return funds that Plaintiffs attempted to transfer from their Cash Grab accounts on January 19 and 20, 2022 at an interest rate

---

[55] *See* Dkt. Nos. 16-3, at 8–9; 1, at ¶ 16.
[56] *RLI Ins. Co. v. 2 G Energy Sys., LLC*, 581 F. Supp. 3d 817, 823 (W.D. Tex. 2020); *see also L. Funder, L.L.C. v. Munoz*, 924 F.3d 753, 761 (5th Cir. 2019).
[57] Dkt. Nos. 1, at ¶ 23; 16-4, at ¶ 6.

of 12%, or $19,040.40 per year.[58] Plaintiffs do not explain the basis of the 12% interest requested, nor do they provide a contractual term for 12% interest on damages arising from a breach of their agreements with Cash Grab. "State law governs the award of pre[-]judgment interest in diversity cases."[59] Texas law sets the pre-judgment interest rate according to the post-judgment interest rate provided in section 304.003 of the Texas Finance Code, which generally sets the rate as "the prime rate as published by the Board of Governors or the Federal Reserve System on the date of computation."[60] Because the current prime rate is 6.75%, the applicable pre-judgment rate is 6.75%.

Plaintiffs additionally request post-judgment interest. Federal law controls post-judgment interest for proceedings in this Court, even when sitting in diversity,[61] and is calculated "from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield[.]"[62] Plaintiffs are therefore entitled to 3.98% interest, the applicable federal rate, on the total judgment amount from the date of judgment until paid in full.

## V. Conclusion

Accordingly, the Court **GRANTS** Plaintiffs' motion for default judgment as to Defendant Cash Grab as to their claims for breach of contract. The Court **DENIES** Plaintiffs' motion in all other respects. All other claims against Defendants CG Financial Services, Inc. d/b/a "Cash Grab" and Andrew DeMaio are **DISMISSED WITHOUT PREJUDICE**. The Court **AWARDS** Plaintiffs: (1) $158,670.00 in breach-of-contract damages, at a rate of $89,670 as to Plaintiff Business Development Network, LLC, $63,000.00 as to Plaintiff The Pod Consulting Company,

[58] Dkt. No. 16, at 7.
[59] *Meaux Surface Prot., Inc. v. Fogleman*, 607 F.3d 161, 172 (5th Cir. 2010).
[60] Tex. Fin. Code § 304.003(c).
[61] *Tricon Energy Ltd. v. Vinmar Int'l, Ltd.*, 718 F.3d 448, 456 (5th Cir. 2013).
[62] 28 U.S.C. § 1961(a).

Inc., and $6,000 as to Plaintiff Leafy Living, LLC; (2) pre-judgment interest to Plaintiffs at a rate of 6.75% from January 22, 2022, until entry of judgment;[63] and (3) post-judgment interest to Plaintiffs at a rate of 3.98% from the entry of judgment until paid in full.

IT IS SO ORDERED.

DONE this 20th day of July, 2026, in San Antonio, Texas.

MICAELA ALVAREZ
SENIOR UNITED STATES DISTRICT JUDGE

[63] The Court calculates a daily rate of $ 29.34 for 1,272 days for a total of $37,467.84, to be divided between the parties according to their percentage of the total damages awarded.